**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
MARTINSBURG**

**MARK EDWARD MILLER,**

Plaintiff,

**v.**

**CAROLYN W. COLVIN,
Acting Commissioner of Social
Security,**

Defendant.

**CIVIL ACTION NO.: 3:15-CV-49
(GROH)**

## REPORT AND RECOMMENDATION

### I.   INTRODUCTION

On April 28, 2015, Plaintiff Mark Edward Miller ("Plaintiff"), acting *pro se*, filed a

Complaint in this Court to obtain judicial review of the final decision of Defendant

Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner" or

"Defendant"), pursuant to Section 205(g) of the Social Security Act, as amended, 42

U.S.C. § 405(g) (2015). (Compl., ECF No. 1). On June 23, 2015, the Commissioner,

through counsel Helen Campbell Altmeyer, Assistant United States Attorney, filed an

Answer and the Administrative Record of the proceedings. (Answer, ECF No. 11;

Admin. R., ECF No. 12). On July 23, 2015, Plaintiff submitted the letter his previously

retained counsel had sent to the Appeals Council on March 5, 2014, as his brief. (Pl.'s

Br., ECF No. 17). On August 24, 2015, the Commissioner filed her Motion for Summary

Judgment and Brief in Support of her Motion for Summary Judgment. (Def.'s Mot. for

Summ. J. ("Def.'s Mot."), ECF No. 26; Def.'s Br. in Supp. of her Mot. for J. on the

Pleadings ("Def.'s Br."), ECF No. 27). The matter has now been referred to the undersigned United States Magistrate Judge for a Report and Recommendation to the District Judge. 28 U.S.C. § 636(b)(1)(B) (2009); Fed. R. Civ. P. 72(b). For the reasons set forth below, the undersigned finds that substantial evidence supports the Commissioner's decision and recommends that the Commissioner's decision be affirmed.

## II. PROCEDURAL HISTORY

On May 24, 2011, Plaintiff protectively filed a Title II claim for disability and disability insurance benefits ("DIB") and a Title XVI claim for supplemental security income ("SSI") benefits, alleging disability that began on January 1, 2004. (R. 11, 183-88). Plaintiff's earnings record shows that he acquired sufficient quarters of coverage to remain insured through December 31, 2004; therefore, Plaintiff must establish disability on or before this date. (R. 11). Plaintiff's claim was initially denied on October 25, 2011, and was denied again upon reconsideration on February 16, 2012. (R. 11, 105). On March 8, 2012, Plaintiff filed a written request for a hearing. (R. 111).

On June 25, 2013, a hearing was held before United States Administrative Law Judge ("ALJ") Anthony Johnson, Jr., in Richmond, Virginia. (R. 29). While Plaintiff failed to appear at this hearing,[1] Robert W. Jackson, an impartial vocational expert, appeared and testified. (R. 29, 120, 148, 160). Additionally, Plaintiff's counsel, Howard L. Metz, Esq., appeared and proffered evidence on behalf of Plaintiff. (R. 29). Afterwards, per Plaintiff's request, a second hearing was scheduled to allow Plaintiff the opportunity to

---

[1] Plaintiff failed to appear at the hearing because he had been "accused of a theft . . . in Maryland [and] . . . [his] brother was waiting for him in the area of the Martinsburg, WV, Social Security Office at the time of the hearing in order to call the police and have him arrested." (R. 162).

testify. (R. 29-30, 163-64). On November 18, 2013, a video hearing was held before ALJ Johnson in Richmond, Virginia. (R. 11, 27). During this hearing, Plaintiff and his counsel appeared in Martinsburg, West Virginia, and only Plaintiff offered testimony. (R. 11).

On January 23, 2014, the ALJ issued an unfavorable decision to Plaintiff, finding that he was not disabled within the meaning of the Social Security Act. (R. 8). Plaintiff requested that the Appeals Council review the ALJ's decision on March 5, 2014. (R. 7). On February 26, 2015, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (R. 1).

### III.   BACKGROUND

#### A.   Personal History

Plaintiff was born on September 19, 1972, and was thirty-eight years old at the time he filed his claim for DIB and SSI benefits. (See R. 64). Plaintiff is single and resides with his mother. (R. 35). He is 6'2" tall and weighs approximately 240 pounds. (R. 200). He completed school through the eighth grade at the Mark Twain School for children with behavioral problems and never received a GED or any specialized, trade or vocational training. (R. 201, 335). Prior to attending the Mark Twain School, Plaintiff was enrolled in special education classes. (R. 335). His prior work experience includes working as laborer for various landscaping business. (R. 208). He alleges that he is unable to work due to the following: (1) back impairments, including sciatica that radiates down both legs; (2) scoliosis; (3) mental impairments (4) an inability to read or write; (5) depression; (6) anxiety; (7) attention deficit hyperactivity disorder (8) a right ankle impairment; (9) emphysema; (10) asthma; (11) left middle finger injuries; (12) pain

in the sternum; (13) high cholesterol and (14) bursitis in the knees and elbows. (R. 200, 220).

**B.    Medical History**

### 1.  Medical History Pre-Dating Alleged Onset Date of January 1, 2004

On October 9, 2003, Plaintiff presented to the emergency room at Jefferson Memorial Hospital in Ranson, West Virginia, complaining of a right ankle injury. (R. 427). During this visit, Plaintiff stated that he had "caught [his] foot in [a] plaster cage and twisted [his] ankle" while at work. (R. 430). Plaintiff further stated that, "[w]hen it happened[, he] felt a pop[ and n]ow when [he] walks on it[,] it pops." (R. 428). After an examination, Plaintiff was diagnosed with a right ankle sprain and prescribed Anaprox DS and Vicodin for pain. (R. 431). Additionally, a splint was applied to his ankle and he was given crutches. (R. 431, 433). As for his ability to work, Plaintiff was instructed that he could return to work on "light duty" on October 12, 2003, and to "regular duty" on October 15, 2003. (R. 434).

On November 17, 2003, Plaintiff returned to Jefferson Memorial Hospital, complaining of continuing right ankle problems. (R. 425). An examination revealed that that the tendons in Plaintiff's right ankle "were subluxating around his fibula, . . . caus[ing] severe pain." (Id.). Plaintiff was diagnosed with a subluxating peroneal tendon. (Id.). That same day, Richard J. Patterson, M.D., performed a surgical repair of Plaintiff's peroneal retinaculum, which Plaintiff tolerated well. (See R. at 425-26). After the surgery, a short-leg walking cast was applied to Plaintiff's right lower leg. (R. 426).

### 2.  Medical History Post-Dating Alleged Onset Date of January 1, 2004

On May 27, 2004, Plaintiff presented to the emergency room at Frederick Memorial Hospital, complaining of right ankle pain when climbing stairs and of numbness in his toes. (R. 270). An X-ray of Plaintiff's right ankle was ordered, which revealed no abnormalities. (R. 269). Subsequently, Plaintiff was diagnosed with an acute right ankle sprain. (R. 271). An ice pack, ace wrap and an air splint were applied to Plaintiff's right ankle. (R. 270-71). Afterwards, Plaintiff demonstrated that he could walk without difficulty and was discharged home. (R. 272).

On June 9, 2004, Plaintiff contacted Scott Orthopedic Center, stating that he had re-injured his right ankle and requesting an evaluation. (R. 286). An appointment was scheduled for June 18, 2004. (R. 286, 296). During this appointment, Plaintiff stated that his tendons were dislocating again and that "he needs to literally reduce this himself when it happens." (R. 296). Plaintiff further stated that he suffered from persistent lateral right ankle pain. (Id.). Jeffrey E. Shook, D.P.M., examined Plaintiff and diagnosed him with "[p]eroneal tendon pathology with recurrent . . . subluxation/dislocation." (R. 297). Dr. Shook prescribed Darvocet for the pain and instructed Plaintiff to wear a lace-up ankle brace. (Id.). Dr. Shook also ordered an MRI of Plaintiff's right ankle. (Id.).

On July 9, 2004, Plaintiff returned to Dr. Shook's office for a follow-up appointment. (R. 294). During this appointment, Plaintiff stated that the tendons in his right ankle "go out of place at least once, maybe twice, a week." (Id.). Plaintiff further stated that when his tendons dislocate, "[i]t is quite painful" and that he wears an ankle brace if he is going to be standing or walking for extended periods of time. (Id.). Dr. Shook reviewed the results of the MRI he had previously ordered, noting that it revealed "clear[] . . . damage to the peroneus longus tendon" as well as "damage to the superior

peroneal retinaculum." (Id.). Dr. Shook then discussed Plaintiff's surgical options with him. (R. 294-95).

On September 8, 2004, Plaintiff presented to Three Gables Surgery Center for a "[r]epair of [the] peroneus brevis tendon with [an] excision of [the] distal lying peroneus brevis muscle" and a "[r]epair of dislocating peroneal tendons without fibular osteotomy." (R. 274). Dr. Shook performed the surgery, which Plaintiff tolerated well. (R. 274-75). Afterwards, Dr. Shook instructed Plaintiff to avoid bearing weight on his right leg and gave Plaintiff crutches. (R. 282). Dr. Shook also instructed him to cease working for at least six weeks[2] and prescribed Lortab for any post-surgical pain. (R. 282, 292).

Over the next several months, Plaintiff returned to Dr. Shook's office for post-surgical check-ups. (R. 284-93). On September 16, 2004, Dr. Shook noted that Plaintiff's incision appeared benign with minimal swelling and that Plaintiff was making "[g]ood progress." (R. 293). On September 24, 2004, Dr. Shook removed Plaintiff's surgical sutures and applied a short-leg fiberglass cast to his right lower leg. (R. 291). Subsequently, on October 8, 2004, Dr. Shook reported that Plaintiff "wants his cast off . . . [because] he has to go to jail today." (R. 289). Dr. Shook refused to remove the cast but noted that Plaintiff was continuing to make "[g]ood progress." (R. 289-90).

On November 5, 2004, Dr. Shook removed Plaintiff's cast as planned and provided him with an equalizer boot. (R. 288). Dr. Shook also instructed Plaintiff to start walking while wearing the equalizer boot and to start performing strengthening exercises. (Id.). On November 19, 2004, however, Dr. Shook noted that Plaintiff was not

---

[2] The record does not detail if, when or for how long Plaintiff attempted to return to work following his right ankle injuries. However, the ALJ determined that, despite any attempts to return to work, Plaintiff "has not engaged in *substantial* gainful activity since January 1, 2004, the alleged onset date." (R. 13) (emphasis added).

wearing the equalizer boot as instructed. (R. 287). Nevertheless, Dr. Shook noted that Plaintiff's tendons were intact and that there was no evidence of dislocation. (Id.). Therefore, instead of an equalizer boot, Dr. Shook advised Plaintiff to start wearing a lace-up ankle brace with a tennis shoe. (Id.).

In November and December of 2004, Plaintiff presented to Holzer Clinic for physical therapy sessions. (R. 299). During a session on December 3, 2004, Plaintiff reported "increased soreness after [the] last session with "popping," although the physical therapist did not hear a popping noise or observe any evidence of subluxation. (Id.). At the end of December, Plaintiff was noted to have attended only four out of nine scheduled sessions. (Id.). Due to the numerous failures to appear, Plaintiff's physical therapy sessions were "discharge[d] secondary to noncompliance." (Id.).

On December 10, 2004, Plaintiff returned to Dr. Shook's office for his final post-surgical check-up. (R. 284). During this visit, Plaintiff stated that he "[felt] as though he should go back to work" and was given permission to do so. (Id.). Dr. Shook advised, however, that Plaintiff continue to wear his lace-up ankle brace. (Id.). Dr. Shook further advised that Plaintiff temporarily wear a silicone patch over his incision line due to occasional irritation along the incision. (Id.).

From on or about January 1, 2010, to on or about April 29, 2010,[3] Plaintiff was incarcerated at Maryland Correctional Institution – Hagerstown.[4] (R. 435-91). During his incarceration, a Physician's Assistant ("PA") provided medical treatment to Plaintiff, primarily for back pain. (R. 449). Plaintiff informed the PA that he suffered from chronic

---

[3] No medical records were submitted for the time period between December 10, 2004, and January 19, 2010.
[4] Plaintiff states that he was incarcerated during this time period because "[he] was convicted of theft." (R. 335).

lower back pain that had been present for several months and that he was experiencing an exacerbation of that pain. (Id.).

On May 31, 2011, Plaintiff presented to the emergency room at Jefferson Memorial Hospital, complaining of severe right ankle pain. (R. 317). Plaintiff stated that he had "rolled his right ankle while on a ladder" and that the "pain was so bad he fell off the ladder and landed on his back." (Id.). An X-ray of Plaintiff's right ankle was ordered, as well as a CT scan of his thoracic and lumbar spine. (Id.). The X-ray of Plaintiff's ankle revealed no abnormalities, nor did the CT scan of his lumbar spine. (R. 330-31). The CT scan of Plaintiff's thoracic spine, however, revealed "[s]uspicious lucencies . . . suggestive of acute fractures, non-displaced" and scoliosis of the upper thoracic spine. (R. 331). Subsequently, Plaintiff was diagnosed with a right ankle sprain and a lumbosacral sprain and contusion, prescribed Dilaudid for his pain and discharged home. (R. 318, 320, 322).

On July 6, 2011, Plaintiff returned to Jefferson Memorial Hospital's emergency room, complaining of lower back pain that radiated down his right leg. (R. 305, 307). After an examination, Plaintiff was diagnosed with back pain. (R. 306). Norco 5/325, Flexeril and prednisone were prescribed for the pain. (R. 315-16).

On June 14, 2011, Plaintiff presented to the emergency room at Berkeley Medical Center, complaining that he had been experiencing upper and lower back pain radiating down his legs since his fall from the ladder on May 31, 2011. (R. 364). During this visit, Plaintiff stated that he had "completely run out of [his] previously prescribed pain medications" and that he was using ibuprofen to control his pain, which was ineffective. (R. 365). After an examination, Plaintiff was diagnosed with nondisplaced

subacute fractures in his thoracic spine based on his previous CT scan results and acute exacerbation of chronic back pain. (Id.). He was prescribed Voltaren and Ultram for his pain and referred to Ravi Yalamanchili, M.D., a neurosurgeon, for evaluation.[5] (R. 366).

On October 14, 2011, Plaintiff returned to the emergency room at Berkeley Medical Center, complaining of chest and back pain that were "worse in the morning." (R. 356-57). During this visit, Plaintiff stated that the pain had been intermittent for the previous six months. (R. 361). Plaintiff further stated that he had undergone a chest X-ray "while in jail about two weeks ago" and that it had revealed a tumor. (Id.). After an examination, Plaintiff was noted to be "[e]xtremely well-appearing" and "in no distress at all." (Id.). A chest X-ray was ordered, which revealed two small calcified granulomas but no tumor. (R. 362, 373). Subsequently, Plaintiff was diagnosed with musculoskeletal chest pain. (R. 362). Plaintiff was prescribed Naproxen for the pain and instructed to employ moist heat and warm soaks. (R. 362, 511). Plaintiff was also referred to the Eastern Panhandle Free Clinic for primary care. (R. 362).

On October 17, 2011, Plaintiff presented to the Eastern Panhandle Free Clinic to establish as a new patient. (R. 409). During an interview, Plaintiff stated that he suffers from, *inter alia*, musculoskeletal chest pain, back pain and occasional heartburn and tingling in his arms. (R. 410). Plaintiff further stated that he suffers from occasional shortness of breath "that is triggered by getting overheated[] [and] eating too fast" and that he smokes one pack of cigarettes per day. (Id.). After an examination, Plaintiff was diagnosed with low back pain and scoliosis. (R. 411). He was prescribed Celebrex for

---

[5] No medical records reflect whether this evaluation by Dr. Yalamanchili occurred.

pain and advised to consider massage therapy. (Id.). He was also referred to the West Virginia University Spine Center for an evaluation. (R. 409).

On November 15, 2011, Plaintiff returned to the Eastern Panhandle Free Clinic for a scheduled appointment. (R. 406-08). During this appointment, Plaintiff was diagnosed with extrinsic asthma and chronic sinusitis, possibly caused by a deviated septum. (R. 408). He was prescribed Asmanex, an inhaler. (Id.). He was also referred to Francisco Sabado, Jr., an otolaryngologist, for treatment of his chronic sinusitis. (R. 407-08). For the next several months, Plaintiff presented to Dr. Sabado for such treatment. (R. 414-16).

On December 9, 2011, Plaintiff presented to the emergency room at Winchester Medical Center after falling from a ladder and dropping approximately ten feet to the ground. (R. 515). Prior to being discharged, Plaintiff was instructed to appear for a follow-up appointment at the Eastern Panhandle Free Clinic. (R. 493, 515). Therefore, on January 16, 2012, Plaintiff presented to the clinic, where he was diagnosed with low back pain. (R. 493-94). Afterwards, Plaintiff was prescribed Skelaxin for his pain and informed that he may benefit from a referral to the West Virginia University Spine Center. (R. 494).

On March 6, 2012, Plaintiff returned to the emergency room at Winchester Medical Center, complaining of back pain. (R. 515). During this visit, Plaintiff stated that he had "run out of" his previously prescribed pain medications. (Id.). C.H. Fowlkes, D.O., examined Plaintiff and noted paravertebral spasms and a "a slight degree of scoliosis." (R. 516). Dr. Fowlkes further noted that "[a]ll of . . . [Plaintiff's] back pain is localized from the muscles, not from the bony aspect." (Id.). Dr. Fowlkes diagnosed

chronic back pain, scoliosis and acute lumbar paravertebral muscle spasms. (R. 515-16). He prescribed valium and tramadol for the pain. (R. 517). He also instructed Plaintiff to apply an ice pack to his back four times a day and issued a referral for physical therapy. (Id.).

On May 18, 2012, Plaintiff presented to the Eastern Panhandle Free Clinic for a scheduled appointment. (R. 495). During this visit, Plaintiff stated that he was experiencing difficulty sleeping due to his back pain. (R. 500). After an examination, Plaintiff was diagnosed with back pain and insomnia. (R. 497). Plaintiff was prescribed Daypro for his back pain and a trial period of amitriptyline for his insomnia. (Id.). Plaintiff was also instructed to present to Winchester Medical Center for an MRI of his lumbar spine, which revealed "[m]ild degenerate endplate changes of the inferior endplate of L5[ and m]ild congenital narrowing of the lumbar spinal canal." (R. 497, 502).

On June 22, 2012, Plaintiff returned to the Eastern Panhandle Free Clinic for a follow-up appointment. (R. 498). During this appointment, Plaintiff stated that his back pain "recently got worse to a point where it was affecting his daily activities." (R. 500). Plaintiff further stated that he had stopped taking Daypro and amitriptyline because they were ineffective. (Id.). When asked how he treats his back pain, Plaintiff explained that he "just goes to the ER" and that "the only thing that seems to help . . . [is] oxycodone." (Id.). Plaintiff was noted to have tried ibuprofen, Skelaxin, Flexeril, Daypro, trazadone, naproxen, Celebrex and amitriptyline for his pain, each of which proved to be ineffective. (Id.). After an examination, the results of Plaintiff's previous MRI were reviewed and faxed to the WVU Spine Center. (R. 500, 502). A response was sent from the WVU Spine Center recommending physical therapy. (R. 500). Subsequently,

Plaintiff was diagnosed with tobacco abuse and "stable" emphysema and referred to physical therapy. (R. 499-500).

### 3. Medical Reports/Opinions

#### a. Disability Determination Examination by Seth Tuwiner, M.D., October 17, 2011

On October 17, 2011, Seth Tuwiner, M.D., a state agency medical consultant, performed a Disability Determination Examination of Plaintiff, concluding that Plaintiff suffers from back pain, a learning disability, bipolar disorder and depression. (R. 376, 378). Prior to the examination, Dr. Tuwiner reviewed Plaintiff's medical records, including a CT scan of Plaintiff's lumbar and thoracic spine performed on May 31, 2011, and treatment notes from Berkeley Medical Center dated June 14, 2011. (R. 376). Additionally, Dr. Tuwiner interviewed Plaintiff regarding the history of his medical impairments. (R. 377). During this interview, Plaintiff informed Dr. Tuwiner that he had suffered from back pain for over ten years and had been diagnosed with scoliosis and degenerative disc disease. (Id.). Plaintiff further informed Dr. Tuwiner that, although he believes he has suffered from bipolar disorder and depression his entire life, he was only diagnosed with these impairments three to four years ago. (Id.). Finally, Plaintiff informed Dr. Tuwiner that he was not taking any medications for his impairments. (Id.).

After interviewing Plaintiff, Dr. Tuwiner performed a physical examination of him. (R. 378). The physical examination revealed mostly normal findings. (See id.). For example, Dr. Tuwiner noted that Plaintiff's coordination, station and gait were normal and that Plaintiff had full range of motion of all of his joints, including of his cervical and dorsolumbar spine. (Id.). Dr. Tuwiner also noted that Plaintiff's motor system was normal and that Plaintiff had "[n]ormal tone and bulk throughout." (Id.). Finally, Dr.

Tuwiner noted that Plaintiff "can [perform] all activities of daily living . . . [and] can walk [ten] minutes at a time." (R. 377).

After the physical examination, Dr. Tuwiner completed a physical residual functional capacity ("RFC") assessment of Plaintiff. (R. 379). During this assessment, Dr. Tuwiner found that:

> The number of hours that [Plaintiff] could be expected to stand and walk in an 8-hour day is without limitation. He has no limitations with sitting. He does not require an assistive device. He has occasional postural limitations with bending, stooping and crouching. He has no manipulative limitations. The amount of weight [he] can lift both frequently and occasionally is without limitation.

(Id.). Dr. Tuwiner further found that Plaintiff does not possess any "other relevant limitations at this point in time." (Id.). On October 24, 2011, Rabah Boukhemis, M.D., reviewed Dr. Tuwiner's RFC assessment and concurred with his findings. (R. 390).

### b. Adult Mental Profile by Harry W. Hood, M.S., August 24, 2011

On August 24, 2011, Harry W. Hood, M.S., a state agency psychologist, performed an Adult Mental Profile of Plaintiff, concluding that: (1) Plaintiff suffers from a back impairment, borderline intellectual functioning, a mood disorder and an anxiety disorder and (2) Plaintiff has a poor prognosis because he is not receiving treatment for his impairments. (R. 333, 337). Prior to his examination of Plaintiff, Dr. Hood reviewed Plaintiff's Adult Function Report and interviewed Plaintiff. (R. 333-34). During the interview, Plaintiff informed Dr. Hood that he was applying for DIB because of his "back, anxiety, and learning disorders." (R. 334). Plaintiff explained that his back and anxiety impairments interfere with his ability to work and that "he is unable to read [or] write at all." (Id.). Plaintiff further informed Dr. Hood that his physical impairments began in 2004 and that his mental impairments began in 2007. (Id.).

Plaintiff also discussed with Dr. Hood the symptoms caused by his impairments, his mental treatment history and his educational background. (R. 334-35). Regarding his symptoms, Plaintiff stated that he feels depressed most days, has feelings of worthlessness and occasionally contemplates death, although Dr. Hood noted that Plaintiff has no overt suicidal thoughts. (R. 334). Plaintiff further stated that he experiences mood swings and difficulty sleeping and concentrating because "his mind is racing constantly." (Id.). Finally, Plaintiff stated that he experiences anxiety-related problems, including excessive worry, anxiety attacks and hand and leg tremors. (Id.). Concerning his mental treatment history, Plaintiff stated that he "is currently not receiving care" or taking prescription medications. (Id.). Plaintiff further stated, however, that he was treated by a psychiatrist while incarcerated at Maryland Correctional Institution – Hagerstown and that, during his incarceration, he was prescribed trazodone and Buspar. (Id.). As for his educational background, Plaintiff stated that he had "completed the [eighth] grade at the Mark Twain School in Rockville, Maryland[,] . . . a special school for [children with] behavioral disorders" and that, prior to attending this school, he had been enrolled in special education classes. (R. 335).

After the interview, Dr. Hood performed a Mental Status Examination of Plaintiff. (R. 333, 336-37). During this examination, Dr. Hood documented Plaintiff's presenting symptoms. (R. 336). For example, Dr. Hood noted that Plaintiff was anxious but cooperative and that, while he demonstrated severely deficient concentration, he also demonstrated fair insight, a well-organized thought process and normal persistence and pace. (Id.). Dr. Hood further noted that Plaintiff's immediate memory was mildly deficient, that his recent memory was severely deficient and that his remote memory

was normal. (Id.). Finally, Dr. Hood noted that Plaintiff reported visually hallucinating snakes while incarcerated at Maryland Correctional Institution – Hagerstown, although Plaintiff denied experiencing hallucinations or illusions since then. (Id.).

Dr. Hood also analyzed Plaintiff's social functioning and daily activities during the Mental Status Examination. (Id.). Regarding Plaintiff's social functioning, Dr. Hood noted that, although Plaintiff reported that his social skills are below average, they appeared normal and appropriate during the interview. (Id.). As for Plaintiff's daily activities, Dr. Hood noted that Plaintiff "awak[ens] between 8:00 a.m. to 9:00 a.m. and then will lie around watching television for the day." (Id.). Dr. Hood further noted that Plaintiff washes laundry once a week and prepares his meals through "microwave cooking." (Id.).

After the Mental Status Examination, Dr. Hood rated Plaintiff's intellectual abilities using the Wechsler Adult Intelligence Scale—Fourth Edition and performed a Wide Range Achievement Test—Fourth Edition on Plaintiff. (R. 333, 335-36). After performing the Wechsler Adult Intelligence Scale, Dr. Hood scored Plaintiff as follows: (1) Verbal Comprehension Scale of 66; (2) Perceptual Reasoning Scale of 77; (3) Working Memory Scale of 63 and (4) Processing Speed Scale of 81. (R. 335). Combined, Dr. Hood reported that these scores resulted in a full scale IQ score of 67. (Id.). Dr. Hood also reported that he believed the "[s]cores secured [are] . . . valid." (R. 336). As for the Wide Range Achievement Test, Dr. Hood analyzed Plaintiff's ability to read words, spell words and compute solutions to math problems. (Id.). Dr. Hood then scored Plaintiff as follows: (1) Word Reading Score of 60; (2) Spelling Score of 55 and (3) Math Computation Score of 63. (Id.). Dr. Hood noted that these scores are the "[g]rade

equivalent" of 2.3, K.5 and 3.0, respectively and that he believed these scores "to be valid." (Id.).

### c. Mental RFC Assessment and Psychiatric Review Technique by Philip E. Comer, Ph.D., August 29, 2011

On August 29, 2011, Philip E. Comer, Ph.D., a state agency consultant, performed a Mental RFC Assessment of Plaintiff, concluding that Plaintiff "appears to have the mental/emotional capacity for simple routine work-like activity in a low pace work environment that can accommodate his physical limitations." (R. 338, 340). During this assessment, Dr. Comer found that Plaintiff is either "not significantly limited" or "moderately limited" in each of the following categories: (1) understanding and memory; (2) sustained concentration and persistence; (3) social interaction and (4) adaptation. (R. 338-39). Dr. Comer further found that Plaintiff is not markedly limited, the most severe ranking of limitation, in any category. (Id.).

After completing his assessment, Dr. Comer completed a Psychiatric Review Technique Form. (R. 341). On this form, Dr. Comer noted that Dr. Hood had diagnosed Plaintiff with borderline intellectual functioning, a mood disorder and an anxiety disorder. (See R. 341-50). Dr. Comer then analyzed the degree of Plaintiff's functional limitations. (R. 351). First, Dr. Comer rated Plaintiff's limitations in maintaining social functioning and in his activities of daily living as "mild." (Id.). Second, Dr. Comer rated Plaintiff's difficulties in maintaining concentration, persistence or pace as "moderate." (Id.). Finally, Dr. Comer rated Plaintiff's episodes of decompensation as "one or two."[6] (Id.).

### d. Disability Determination Explanation by A. Rafael Gomez, M.D., February 13, 2012

---

[6] These findings depict the four "paragraph B" criteria that the Code of Federal Regulations sets forth for evaluating the severity of claimants' mental impairments. See 20 C.F.R. § 416.920a.

On February 13, 2012, A. Rafael Gomez, M.D., a state agency medical consultant, prepared the Disability Determination Explanation at the Reconsideration level. (R. 64-76). Prior to drafting this explanation, Dr. Gomez reviewed, *inter alia*, Plaintiff's medical records, treatment notes, Personal Pain Questionnaire, Adult Function Report, Work History Report and Disability Reports. (R. 65-70). After reviewing these documents, Dr. Gomez concluded that Plaintiff suffers from organic mental disorders, which he categorized as severe in nature, and spine disorders, which he categorized as non-severe in nature. (R. 74). Dr. Gomez further concluded that Plaintiff has the RFC to perform simple, low-pace work. (R. 75). Finally, Dr. Gomez concluded that Plaintiff is capable of performing his past relevant work as a laborer for a landscaping company. (Id.).

## C.  Testimonial Evidence

During the administrative hearing held on November 18, 2013, Plaintiff divulged his relevant personal facts and educational background. (R. 32-34, 43-45). During his school years, Plaintiff was enrolled in special education classes until he transferred to the Mark Twain School in Rockville, Maryland, a school for children with behavioral problems. (R. 31, 43). Plaintiff was transferred to the Mark Twain School because he would act out during class by "joking [and] funning around." (R. 44). Plaintiff acted out because he felt the teachers would assist the other students but not him. (Id.). In fact, Plaintiff believes that he would progress to the next grade "[j]ust [so the teachers could] get rid of [him]." (R. 33). Plaintiff's highest level of education is the "seventh or eighth" grade." (R. 32). While he is able to read "very, very small [words]," he is unable to use a computer, write anything except for his name or operate a motor vehicle because he

does not possess a driver's license. (R. 34, 45). Currently, Plaintiff resides with his mother who "takes care of [him]." (R. 35).

Plaintiff also testified regarding his employment history. Plaintiff has prior work experience as a laborer for various landscaping companies. (R. 35). As a laborer, Plaintiff would convene with his "crew," which consisted of three or four other laborers, in the morning and "ride around" with them throughout the day. (R. 38-39). The crew would then divide their job duties, which included weeding and mowing the grass, among individual workers. (Id.).

Plaintiff testified that he suffers from several physical impairments, including right ankle pain and back pain. (R. 35-39, 45). Regarding his right ankle pain, Plaintiff injured his right ankle in 2003 while working as a laborer, which is when the pain began. (See R. 35-36). While the injury was corrected with surgery, Plaintiff re-injured the ankle approximately one month later, requiring an additional surgery. (R. 36). Although Plaintiff initially received workers' compensation for these injuries, he has "no coverage [for his right ankle] anymore" so he is unable "to get it fixed properly." (R. 36, 37). Plaintiff states that his right ankle impairment prevents him from working as a laborer because he is unable "to walk too much." (R. 45). Plaintiff explains that if he walks for an extended period of time, his ankle swells and becomes painful. (Id.).

As for his back pain, Plaintiff describes the pain as "feel[ing] like somebody . . . stabs [him]" in the lower back.[7] (R. 37). When he was a teenager, Plaintiff was struck by a vehicle when he was walking across a road. (Id.). Afterwards, he did not seek treatment because he "wasn't supposed to be crossing the road." (R. 38). Plaintiff

---

[7] During the first administrative hearing, Plaintiff's counsel proffered that Plaintiff "has [experienced] ten years of back problems." (R. 53).

believes his back pain is caused by his injuries from this incident as well as "just doing labor work [and p]robably lifting [objects] the wrong way." (Id.). Due to his back pain, Plaintiff states that he is unable to bend over and tie his shoelaces. (R. 37). Plaintiff further states that he sought treatment for his back pain from the Eastern Panhandle Free Clinic, although "that didn't work too good[] because they wanted [him] to go . . . see one of their doctors in Morgantown," which he could not afford. (Id.).

In addition to physical impairments, Plaintiff testified that he suffers from mental impairments. (R. 39-43). Plaintiff experiences difficulty staying focused and socializing with others. (R. 39). To illustrate his lack of focus, Plaintiff states that when [he] go[es] to church on Sundays . . . [he] can't stay focused [on] the pastor." (Id.). He explains that "sometimes [he] just stop[s] caring" and is unable to concentrate. (Id.). As for his ability to socialize, Plaintiff states that he gets along with his mother but does not have any friends. (R. 43). Plaintiff also has difficulty controlling his temple. (See R. 40, 42). For example, Plaintiff states that, when incarcerated at Maryland Correctional Institution - Hagerstown, he felt like he "was going to kill [his] bunk buddy" over "little things [that made] him upset." (R. 40). Plaintiff further states that, outside of prison, he "ha[s] a tendency to throw stuff" when "something [doesn't] go [his] way." (R. 42). Plaintiff is not currently receiving treatment for his mental impairments, although he was previously prescribed medication for the impairments and received counseling while incarcerated. (R. 40).

**D.  Vocational Evidence**

**1.  Vocational Testimony**

Robert W. Jackson, an impartial vocational expert, testified during the June 25, 2013, administrative hearing. (R. 48, 55-60). Initially, Mr. Jackson agreed with the ALJ's determination that Plaintiff has no prior relevant work history. (See R. 55). Mr. Jackson then responded to several hypothetical questions posed by the ALJ. (R. 55-58). In the first hypothetical, the ALJ requested that Mr. Jackson assume an individual with the same age, education and work experience as Plaintiff. (R. 55-56). The ALJ further requested that Mr. Jackson assume the hypothetical individual possesses no exertional limitations but:

> Q:     [W]ith respect to nonexertional limitations would be able to use common sense understanding to perform detailed, but uninvolved oral or written instructions, and that's consistent with a range of unskilled work. Specifically unskilled work at reasoning level two, as those terms are defined in the [DOT]. Now, notwithstanding my functional description of reasoning level two, . . . I would indicate there is information in this file that suggests the individual in question is unable to read or very limited in the ability to read. So, the work should not involve reading as an essential component of either performing the job or being able to learn the job. Really the job should be something that could be learned by demonstration or oral instruction. . . . This individual is able to perform low stress jobs, and I'll define low stress as jobs that would not be performed at an assembly line pace. That have few work place changes, little independent decision making and no responsibility for the safety of others.

(R. 56-57). In response to this hypothetical, Mr. Jackson stated that such an individual would be able to perform work as a grounds keeper/gardener or a cleaner. (R. 57). The ALJ then repeated his question, asking Mr. Jackson to consider an individual with same qualifications but who could:

> Q:     [L]ift, carry, push or pull 50 pounds occasionally and 25 pounds frequently, stand and/or walk six hours in an eight-hour workday and sit six or more hours in an eight-hour workday. Frequently climb ladders, ropes and scaffolds. Frequently balance. No

> limitations in the ability to stoop. No limitations in the ability to kneel. And frequently able to crawl. . . .

(Id.). Mr. Jackson responded that such an individual could still work as a grounds keeper/gardener or a cleaner. (Id.). Subsequently, the ALJ continued to build on his previous hypotheticals, changing only the hypothetical individual's ability to stand and walk, which he reduced to four out of eight hours instead of six out of eight. (Id.). In response to this third hypothetical, Mr. Jackson responded that such an individual could perform work at the sedentary level as a packer or material handler. (R. 58). Finally, the ALJ added the following limitations for Mr. Jackson's consideration: the hypothetical individual is absent from work for two or more days a month on a persistent basis and is off task more than ten percent of the time. (Id.). Mr. Jackson responded that such an individual would not be employable with the addition of either limitation. (Id.). After answering the ALJ's hypothetical questions, Mr. Jackson testified that his testimony was consistent with the Dictionary of Occupational Titles ("DOT"). (Id.).

Plaintiff's counsel, Mr. Metz, also presented hypothetical questions to Mr. Jackson. Mr. Metz asked that Mr. Jackson consider an individual with a marginal education under the eighth grade level. (R. 59). Mr. Jackson responded that such an individual would be able to work as a groundskeeper/gardener, cleaner, packer and material handler. (Id.). Mr. Metz then asked that Mr. Jackson consider an individual who does not possess even a marginal education and who is illiterate. (Id.). Mr. Jackson theorized that such an individual could work as a groundskeeper and cleaner but that the packer position "could present a problem." (Id.). Mr. Jackson further theorized that the number of available job positions would be reduced by approximately twenty-five percent. (R. 59-60).

## 2. Work History Reports & Disability Reports

On June 17, 2011, B. Kelly conducted a teleclaim interview with Plaintiff and completed a Disability Report for him. (R. 196-207). In the report, B. Kelly indicated that the following impairments limit Plaintiff's ability to work: (1) back problems; (2) scoliosis; (3) mental health issues and (4) an inability to read or write. (R. 200). B. Kelly stated that Plaintiff stopped working on January 1, 2004, [b]ecause of [his] condition[s]." (Id.). B. Kelly further stated that Plaintiff had received treatment for physical conditions but not for mental treatments and listed Buspar, Lortab and trazodone as Plaintiff's prescribed medications. (R. 202-03).

B. Kelly also described Plaintiff's relevant work history in the Disability Report. (R. 201-02). B. Kelly stated that Plaintiff had worked as a laborer for various employers from 1996 through 2004. (R. 201). B. Kelly estimated that, in Plaintiff's typical six-hour workday as a laborer, Plaintiff would walk and stand for five hours, kneel for four hours, reach out with his arms and stoop for three hours, sit, climb and crouch for two hours and crawl and handle small and large objects for one hour. (R. 202). B. Kelly further estimated that Plaintiff would frequently lift ten pounds and that the heaviest object Plaintiff lifted was fifty pounds. (Id.). B. Kelley also stated that Plaintiff was required to use machines, tools and other equipment as a laborer. (Id.). Finally, B. Kelley stated that Plaintiff has never received any specialized job, trade or vocational training. (R. 201).

On July 11, 2011, Yvonne Miller, Plaintiff's mother, completed a Work History Report for Plaintiff. (R. 208-10). In the report, Ms. Miller indicated that Plaintiff's employment history consists of working as a laborer in the landscaping business. (R.

208). While Ms. Miller explained that the duties of a laborer vary with each assignment, she stated that Plaintiff generally would mow lawns, plant and prune flowers and shrubs and trim tree branches. (R. 209-10). She further stated that the position required using machines, tools and other equipment and frequently lifting ten-pound objects. (R. 209). Finally, Ms. Miller stated that the heaviest object Plaintiff would lift on the job weighed fifty pounds. (Id.).

On December 5, 2011, Plaintiff's counsel, Mr. Metz, submitted a Disability Report-Appeal form on behalf of Plaintiff. (R. 219-24). On this form, Mr. Metz reported that Plaintiff had experienced a change in his condition. (R. 219). Specifically, Mr. Metz reported that, in November of 2011, Plaintiff's pain had increased in his back and legs. (Id.). Mr. Metz explained that Plaintiff now finds "[it] [h]arder to move around" and experiences difficulty caring for his personal needs. (R. 219, 223). Mr. Metz also updated Plaintiff's list of diagnoses to include the following impairments: sciatica into both legs, depression, anxiety, attention deficit hyperactivity disorder, right ankle injuries, emphysema, asthma, left middle finger injuries, pain in the sternum, high cholesterol and bursitis in the knees and elbows. (R. 220). Finally, Mr. Metz declared that, since Plaintiff's last Disability Report, Plaintiff had received treatment for mental impairments as well as his physical impairments. (Id.).

On March 8, 2012, Mr. Metz submitted a second Disability Report-Appeal form on behalf of Plaintiff. (R. 239-44). On this form, Mr. Metz reported another change in Plaintiff's condition. (R. 239). Specifically, Mr. Metz stated that Plaintiff now experiences "[m]ore difficulty breathing and [catching his] breath[] after and during activity." (Id.). Mr.

Metz estimated that the change occurred in December of 2011. (Id.). Mr. Metz also updated Plaintiff's list of impairments to include emphysema. (Id.).

**E. Lifestyle Evidence**

**1. First Adult Function Report, July 11, 2011**

On July 11, 2011, Plaintiff's mother Yvonne Miller completed an Adult Function Report for Plaintiff. (R. 211-18). In this report, Ms. Miller states Plaintiff is unable to work due to "[s]evere pain in [his] back when doing any kind of physical activity." (R. 211). Ms. Miller further states that Plaintiff experiences feelings of depression and is unable read. (R. 215, 217).

Ms. Miller explains how Plaintiff is limited in some ways but not others. In several activities, Plaintiff requires no or minimal assistance. (See R. 212-17). For example, Plaintiff is able to perform his own personal care. (R. 212). He is also able to perform certain household activities such as washing laundry and washing dishes. (R. 213). While he does not have a driver's license, he is able to leave the house without assistance and go shopping for clothing and food. (R. 214). Plaintiff has no difficulty engaging in social activities and performs such activities as watching television or playing board games with others. (R. 215). He is able to pay bills, count change, handle a savings account and use a checkbook. (R. 214). He is also able to handle stress and changes in his routine, get along with authority figures, complete tasks and follow spoken instructions. (R. 216-17). Finally, he is able to walk the length of two city blocks before requiring a five-minute rest. (R. 216).

While Plaintiff is able to perform some activities, Ms. Miller describes how others prove more difficult due to his impairments. Plaintiff's impairments affect his ability to lift,

squat, bend, stand, walk, sit and kneel. (R. 216). For example, Plaintiff is unable to stand for long periods of time, lift more than two bags of groceries or kneel, bend or squat at all. (Id.). Because of his impairments, Plaintiff is no longer able to perform yard work or play ball at family gatherings. (R. 214-15). He also has difficulty sleeping due to the pain his impairments cause. (R. 212).

Finally, Ms. Miller describes Plaintiff's daily activities. (R. 211-15). Plaintiff resides in a house with his mother, who assists with his care and prepares his meals. (R. 211-13). After he awakens in the morning, Plaintiff spends his day "lay[ing] around and watch[ing] television]." (R. 212). Plaintiff also goes outside to retrieve the mail occasionally and attends church regularly. (R. 214-15).

### 2. Personal Pain Questionnaire, December 26, 2011

On December 26, 2011, Plaintiff submitted a Personal Pain Questionnaire that had been completed by Sarah, a friend of Plaintiff's, in his presence.[8] (R. 226-30). In this questionnaire, Plaintiff reports that he suffers from pain in his back and legs, from the "hips to [the] ankle[s]." (R. 226). When describing the pain, Plaintiff characterizes it as continuous and aching, throbbing and crushing in nature. (Id.). Plaintiff states that walking, sitting, standing, lifting and lying down worsen the pain and that medication alleviates the pain. (Id.). Plaintiff explains, however, that he does not take any pain medication because he cannot afford it. (R. 227).

### 3. Second Adult Function Report, December 26, 2011

Also on December 26, 2011, Plaintiff submitted a second Adult Function Report that had been completed by his friend Sarah in his presence. (R. 231-38). In this report,

---

[8] Sarah did not provide her last name. (R. 230). Plaintiff later testified that Sarah is his brother's girlfriend. (See R. 34).

Plaintiff states that he is unable to work because he has a "[v]ery limited ability to walk [and] stand" and because "[s]itting hurts after short periods." (R. 231). Plaintiff further states that he is limited in his ability to concentrate, read and write. (Id.). Finally, Plaintiff states that he suffers from depression and "cr[ies] all the time." (Id.).

Plaintiff explains that he has become more limited in his physical and mental abilities since his last Adult Function Report. Regarding his physical abilities, Plaintiff's impairments now affect his ability to perform all physical activities except seeing and using his hands. (R. 236). He is no longer able to walk the length of one city block and requires a twenty-minute rest after walking. (Id.). Additionally, he is no longer able to lift objects of any weight and experiences difficulty performing his own personal care. (R. 232-33, 236). For example, he needs reminded to take a shower and to take his medications and at times requires assistance rising from a toilet seat or from the bathtub. (Id.). He does not do any house or yard work and, while he leaves the house once or twice a month, he requires accompaniment when he does so. (R. 233, 235).

As for his mental abilities, Plaintiff is not able to concentrate for longer than two to three minutes. (R. 236). He is unable to handle stress or changes in his routine, get along with authority figures, complete tasks or handle his finances. (R. 234, 236-37). He is unable to follow written instructions and has difficulty following spoken instructions. (R. 236-37). He reports that he has been terminated from a job position due to his inability to follow instructions. (Id.). He also has difficulty socializing with others and does not spend time with others. (Id.).

Finally, Plaintiff describes his daily activities. After Plaintiff awakens, he dresses himself. (R. 232). He then watches television all day and "try[s] to [get and] stay

comfortable." (R. 232, 235). He is able to prepare his own meals and does so at times. (See R. 232). Occasionally, he goes outside the house, although he clarifies that he does not do this often. (R. 234). For example, he goes food shopping once a month. (Id.). At night, he has difficulty sleeping because "[i]t hurts to lay in bed," so he "[gets] up off and on all night." (R. 232). His daily medications include Lipitor and an albuterol inhaler. (R. 238).

### 4. Daily Activities Questionnaire, January 18, 2013

On January 18, 2013, Plaintiff submitted a Daily Activities Questionnaire. (R. 248-52). In this questionnaire, Plaintiff describes what a typical day is like for him. (Id.). Plaintiff lives in a house with his mother, who assists with his care after he awakens around 5:00 A.M. (See R. 251, 248-49). For example, while Plaintiff is able to perform his own personal care, he occasionally requires assistance from his mother to physically remove himself from bed. (R. 249). Plaintiff's mother also manages his finances, performs the household chores and prepares all of his meals, although at times he will assemble a simple sandwich on his own. (R. 248-50). Plaintiff spends his day watching television, although he stands up and moves around frequently due to his inability to sit longer than twenty minutes. (R. 249). He also takes naps throughout the day because his pain causes him to have difficulty sleeping at night. (R. 251). He does not perform activities outside of his home such as grocery shopping or attending church. (R. 248). He also does not have a driver's license or use public transportation because of his inability to read signs. (R. 249-50). While he does not engage in social activities, he does visit family members twice a year. (R. 250). Plaintiff retires to bed around 9:00 P.M. every evening. (R. 251).

Plaintiff also discusses his past work and how his impairments affected his work. (R. 252). As a laborer for various landscaping companies, Plaintiff experienced difficulty maintaining his work routine because his "mind would wander," although his boss "understood and would help get [him] back on task." (Id.). Plaintiff also experienced difficulty handling changes that occurred on the job and required periodic rest periods throughout a workday. (Id.). However, Plaintiff had no difficulty with punctuality, absences or getting along with his co-workers and was never forced to leave work because of his impairments. (Id.). Plaintiff ceased working in 2004 when he injured his right ankle. (Id.).

## IV.    THE FIVE-STEP EVALUATION PROCESS

To be disabled under the Social Security Act, a claimant must meet the following criteria:

> [The] individual . . . [must have a] physical or mental impairment or impairments . . . of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. . . . '[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A) (2004). The Social Security Administration uses the following five-step sequential evaluation process to determine whether a claimant is disabled:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.
>
> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a

28

combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

[Before the fourth step, your [RFC] is evaluated "based on all the relevant medical and other evidence in your case record . . . ."]

(iv) At the fourth step, we consider our assessment of your [RFC] and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your [RFC] and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520 (2015); 20 C.F.R. § 416.920 (2012). In steps one through four, the burden is on the claimant to prove that he or she is disabled and that, as a result of the disability, he or she is unable to engage in any gainful employment. Richardson v. Califano, 574 F.2d 802, 804 (4th Cir. 1978). Once the claimant so proves, the burden of proof shifts to the Government during step five to demonstrate that jobs exist in the national economy that the claimant is capable of performing. Hicks v. Gardner, 393 F.2d 299, 301 (4th Cir. 1968). If the claimant is determined to be disabled or not disabled at any of the five steps, the process will not proceed to the next step. 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.

## V.    ADMINISTRATIVE LAW JUDGE'S DECISION

Utilizing the five-step sequential evaluation process described above, the ALJ made the following findings:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2004.

2.    The claimant has not engaged in substantial gainful activity since January 1, 2004, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.    The claimant has the following severe impairments: borderline intellectual functioning, mood disorder and anxiety disorder. (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the [RFC] to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant is able to use commonsense understanding to perform detailed but uninvolved written or oral instructions consistent with a range of unskilled work at reasoning level two as those terms are defined in the Dictionary of Occupational Titles, and is able to perform low stress jobs, defined as jobs not performed at an assembly-line pace, with few workplace changes, little independent decision making and no responsibility for the safety of others.

6.    The claimant has no past relevant work (20 CFR 404.1565 and 416.965).

7.    The claimant was born on September 19, 1972 and was 31 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.    The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568 and 416.968).

10.   Considering the claimant's age, education, work experience, and [RFC], there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.   The claimant has not been under a disability, as defined in the Social Security Act, from January 1, 2004, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(R. 13-21).

## VI.   DISCUSSION

### A.   Contentions of the Parties

Plaintiff asserts that the Commissioner's decision is contrary to the law and is not supported by substantial evidence. (Pl.'s Br. at 2). Specifically, Plaintiff contends that the ALJ erred in finding that: (1) Plaintiff's right ankle and back impairments are non-severe in nature and (2) Plaintiff's impairments fail to meet a listing. (Id. at 3). Plaintiff requests the Court to either reverse the Commissioner's decision and enter judgment in his favor or remand the case for a new hearing. (Id. at 7).

Alternatively, Defendant asserts that the Commissioner's decision "is supported by substantial evidence." (Def.'s Mot. at 1). To counter Plaintiff's arguments, Defendant contends that: (1) Plaintiff has not proven that he is disabled and (2) substantial evidence supports the ALJ's determination that Plaintiff's impairments fail to meet a listing. (Def.'s Br. in Supp. of her Mot. for Summ. J. ("Def.'s Br.") at 4-5, ECF No. 27). Defendant requests the Court to affirm the Commissioner's decision. (Id. at 9).

### B.   Scope of Review

In reviewing an administrative finding of no disability, the scope of review is limited to determining whether the ALJ applied the proper legal standards and whether the ALJ's findings are supported by substantial evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). A "factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829

F.2d 514, 517 (4th Cir. 1987). Likewise, a factual finding by the ALJ is not binding if it is not supported by substantial evidence. Richardson v. Perales, 402 U.S. 389, 401 (1971). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Id. (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). When determining whether substantial evidence exists, a court must "not undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ's]." Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005).

**C.      Analysis of the Administrative Law Judge's Decision**

**1.   Whether the ALJ Erred in Determining that Plaintiff's Right Ankle and Back Impairments are Non-Severe in Nature**

The first issue is whether the ALJ erred in determining that Plaintiff's right ankle and back impairments are non-severe in nature. Specifically, Plaintiff challenges the ALJ's determination that the functional limitations caused by his right ankle and back impairments lasted for a time period of less than one year. (Pl.'s Br. at 4). Defendant counters by arguing that the Plaintiff failed to prove that his right ankle and back impairments are severe in nature. (See Def.'s Br. at 4-5).

At step two of the sequential evaluation process, a claimant bears the burden of proving that he or she suffers from a medically determinable impairment that is severe

in nature. <u>Farnsworth v. Astrue</u>, 604 F. Supp. 2d 828, 851 (N.D. W. Va. 2009). When proving that he or she suffers from a medically determinable impairment, the claimant must show more than a "mere diagnosis of condition . . . . [I]nstead, there must be a showing of related functional loss." <u>Pierce v. Colvin</u>, No. 5:14CV37, 2015 WL 136651, at *16 (N.D. W. Va. 2015) (citations omitted). Moreover, the claimant must show that the impairment has lasted or is expected to last for a continuous period of at least twelve months, unless the impairment is expected to result in death. 20 C.F.R. § 404.1509 (1980). After such a showing, an impairment will be considered severe when, either by itself or in combination with other impairments, it "significantly limits [a claimant's] physical or mental abilit[ies] to [perform] basic work activities." <u>Pass v. Chater</u>, 65 F.3d 1200, 1203 (4th Cir. 1995) (quoting 20 C.F.R. § 416.920). Conversely, an impairment will be considered "'not severe' . . . if it [constitutes] a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with [basic work activities]." <u>Evans v. Heckler</u>, 734 F.2d 1012, 1014 (4th Cir. 1984) (emphasis removed). Basic work activities are "the abilities and aptitudes necessary to do most jobs," including the capacities for seeing, hearing and speaking and such physical functions as walking and standing. 20 C.F.R. § 404.1521 (1985).

In the present case, the undersigned finds that the ALJ did not err in determining that Plaintiff's right ankle and back impairments are non-severe in nature. At step two of the sequential evaluation process, the ALJ determined that Plaintiff's borderline intellectual functioning, mood disorder and anxiety disorder are severe in nature. (R. 13). Additionally, the ALJ determined that "[a]ll other impairments alleged in the record are . . . non-severe, because they did not exist for a continuous period of twelve

months, were responsive to medication, did not require significant medical treatment or did not result in any continuous exertional or non-exertional functional limitations." (Id.).

The ALJ then specifically discussed Plaintiff's right ankle and back impairments. (R. 14-16). Regarding Plaintiff's right ankle impairment, the ALJ noted that Plaintiff underwent surgery in November of 2003 and in September of 2004. (R. 14). The ALJ further noted that, after Plaintiff's second surgery, Dr. Shook documented that Plaintiff was making good progress and that there was no evidence of dislocation or subluxation of the tendons. (Id.). Therefore, the ALJ concluded that "[t]he record does not support a finding that this impairment caused functional work related limitations for greater than one year." (Id.).

Regarding Plaintiff's back impairment, the ALJ noted that Plaintiff fell off of a ladder in May of 2011 and reviewed treatment records from that time on until March of 2012. (R. 14-16). The ALJ further noted that an MRI of Plaintiff's lumbar spine, performed in May of 2012, showed normal alignment of the vertebral bodies, no compressional fractures and only mild degenerative changes. (R. 15). The ALJ thus concluded that a "[r]eview of the record, including [Plaintiff's] course of treatment, objective findings and imaging studies, does not support a finding of any functional limitations lasting for greater than one year stemming from [this] impairment[]." (R. 16).

Plaintiff argues that the "ALJ confuse[d] length of medical treatment with continuation of functional limitation." (Pl.'s Br. at 4). In other words, Plaintiff argues that, although he may not have received treatment for his right ankle and back impairments for a time period ranging over one year, these impairments cause ongoing functional loss. (Id.). In his decision, the ALJ acknowledged that Plaintiff alleges "[ten] years of

back pain" and that Plaintiff's believes he needs additional surgery on his right ankle. (R. 19). However, the ALJ also determined that Plaintiff is "not entirely credible." (Id.). Indeed, while the ALJ recognized Plaintiff's various medical diagnoses, the ALJ could find no related functional loss caused by Plaintiff's right ankle or back impairments. (See R. 19-20). For example, the ALJ noted that Plaintiff is able to perform his own personal care, wash dishes, go shopping for food and clothes in stores, wash laundry, attend church and even climb ladders. (Id.). Because Plaintiff does not challenge the ALJ's credibility determination, the ALJ's determination that Plaintiff's right ankle and back impairments have not lasted for a continuous period of twelve months must be upheld.

Furthermore, assuming *arguendo* that the ALJ did err in determining that Plaintiff's right ankle and back impairments are non-severe in nature, such error is harmless. An ALJ's failure to find that a specific impairment is severe at step two constitutes harmless error "if the ALJ 'continued through the remaining steps [of the evaluation process] and considered all of the claimant's impairments [during each step].'" Pierce, 2015 WL 136651, at *19. In this case, the ALJ determined that Plaintiff suffered from three severe impairments and thus continued through the remaining steps of the evaluation process, considering Plaintiff's right ankle and back impairments in combination with Plaintiff's severe impairments as he did so. (See R. 16, 18, 21) (depicting the ALJ's statements that all of Plaintiff's symptoms and impairments were considered at each step). Consequently, no reversible error was committed.

### 2. Whether the ALJ Erred in Determining that Plaintiff's Impairments Fail to Meet a Listing

The next issue is whether the ALJ erred in determining that Plaintiff's impairments fail to meet a listing. Specifically, Plaintiff argues that his impairments

"meet or equal Listing 12.05C and D." (Pl.'s Br. at 1). Alternatively, Defendant argues that "substantial evidence supports the ALJ's determination that Plaintiff d[oes] not meet or medically equal the requirements of Listing 12.05." (Def.'s Br. at 5).

At step three of the sequential evaluation process, a claimant bears the burden of proving that his or her medical impairments meet or equal the severity of an impairment recorded in the "Listing of Impairments," located at 20 C.F.R. Part 404, Subpt. P, App. 1 (2015). Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). If a claimant meets this burden, then the claimant "establishes a prima facie case of disability." Id. Listing 12.05, the only contested listing in this case, "applies to claims for disability based upon [intellectual disability]." Young v. Bowen, 858 F.2d 951, 953 n.2 (4th Cir. 1988). Under this listing, "intellectual disability" is defined as "significantly subaverage general intellectual functioning *with deficits in adaptive functioning initially manifested during the developmental period*; i.e., the evidence demonstrates or supports onset of the impairment before age [twenty-two]." 20 C.F.R. Part 404, Subpt. P, App. 1 § 12.05 (emphasis added). If a claimant fulfills this definition, then the claimant must additionally fulfill one of four other requirements, including:

    C.    A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

        OR

    D.    A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:

        1.    Marked restriction of activities of daily living; or
        2.    Marked difficulties in maintaining social functioning; or
        3.    Marked difficulties in maintaining concentration, persistence, or pace; or
        4.    Repeated episodes of decompensation, each of extended duration.

Id.

In the present case, the undersigned finds that the ALJ did not err in determining that Plaintiff's impairments fail to meet a listing. At step three of the sequential evaluation process, the ALJ determined that the severity of Plaintiff's "mental impairments, considered singly and in combination, do not meet or medically equal the criteria" of Listing 12.05. (R. 16). Specifically, the ALJ determined that Plaintiff does not have an intellectual disability because, while he possesses significantly subaverage general intellectual functioning, he does not possess deficits in adaptive functioning. (R. 17). In his reasoning, the ALJ reported that the Code of Federal Regulations' definition of "intellectual disability" is in line with the definition of "mental retardation" in the Diagnostic and Statistical Manual of Mental Disorders 4th Edition ("DSM-IV"). (R. 18). The ALJ then noted that, under the DSM-IV, "adaptive functioning" is defined as "how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting." (Id.). The ALJ further noted that, because Plaintiff is able to perform all activities of daily living, go shopping for food and clothes and attend church, he has no such deficit in adaptive functioning. (Id.).

Plaintiff raises several arguments challenging the ALJ's determination that Plaintiff's impairments fail to meet Listing 12.05. First, Plaintiff contends that the "evidence that [Plaintiff's] IQ was 70 or below before age [twenty-two] is supported by . . . evidence which cannot be rebutted." (Pl.'s Br. at 3). The ALJ, however, did not refute that Plaintiff possesses subaverage general intellectual functioning, only that he fails to

possess deficits in adaptive functioning.[9] (R. 18). Second, Plaintiff contends that "the Listing was met as soon as the ALJ" found "severe impairments of mood disorder and anxiety disorder" because these impairments constitute "a physical or other mental impairment imposing an additional and significant work-related limitation of function" under Listing 12.05C. (Pl.'s Br. at 3). The ALJ, however, did not need to determine whether Plaintiff possessed such a physical or other mental impairment because he had previously determined that Plaintiff fails to meet the threshold requirements of Listing 12.05 by failing to possess deficits in adaptive functioning. (R. 18). Finally, Plaintiff argues that the ALJ "should have considered . . . [his right ankle and back impairments], emphysema, anxiety, mood disorder and depression in combination and not separately under Listing 12.05." (Pl.'s Br. at 4). Yet the ALJ specifically stated that he considered Plaintiff's impairments singly and in combination when determining whether Plaintiff's impairments met a listing. (R. 16). Moreover, Plaintiff offers no evidence to support this argument. Consequently, Plaintiff's arguments are without merit.

## VII.   RECOMMENDATION

For the reasons herein stated, I find that the Commissioner's decision denying Plaintiff's application for DIB and SSI benefits is supported by substantial evidence. Accordingly, I **RECOMMEND** that Defendant's Motion for Summary Judgment [ECF No. 26] be **GRANTED**, the decision of the Commissioner be affirmed and Plaintiff's Complaint [ECF No. 1] be **DISMISSED WITH PREJUDICE**.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections

---

[9] Plaintiff does not challenge the ALJ's determination that he fails to possess deficits in adaptive functioning.

identifying the portions of the Report and Recommendation to which objections are made and the basis for such objections. A copy of such objections should also be submitted to the Honorable Gina M. Groh, Chief United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841, 845-48 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140, 155 (1985).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted this 17th day of December, 2015.

ROBERT W. TRUMBLE
UNITED STATES MAGISTRATE JUDGE